This morning is submitted on the briefs so we will move to our fourth case Whitaker v. Dempsey Mr. Kelleher, good morning Good morning your honors, Christopher Kelleher for the appellant The district court in this case admitted that this matter turns on a credibility dispute yet the court decided it could decipher who was being more truthful. With due respect to the district court, this approach strikes at the heart of rule 56 and hijacks the fact-finding process. We thus ask that a jury resolve this credibility clash. Can a he said she said dispute be resolved at summary judgment? It can't, but that's the exception, not the rule. And there's nothing to suggest that this case fits that rare paradigm. Actually this is a he said they said. True, that is true. It's his version of events which has shifted significantly over the course of the litigation and he's been kind of all over the map on all kinds of key issues. Issues key to his claim and the defendants have been consistent and unified in their responses that it didn't happen the way he said it happened. Certainly in either instance. My my position or my my case would be easier if if Mr. Whitaker had been consistent. However, if I can point out a few things which which underlie this inconsistency and one is obviously his his mental state. I don't think there's any dispute that there are some some mental issues here. Obviously he's in the crisis wing of a state prison. The degree of of his mental issues obviously might be disputed, but so I think to your to your question, I think part of the inconsistency is is due to his mental instability. Obviously he was pro se initially when he filed his his first two complaints and then obviously counsel was appointed and that that changed the dynamics a little bit. So there's there's that as well. Going to the actual inconsistencies. I would I would argue that they're more peripheral, at least as far as the the cutting object itself. You know, there's issues as to well if it was one inch versus two inches, you know, something regarding those dimensions and ultimately I don't think that matters in the grand scheme of things because of the damage that this cutting object that we allege he had did. So again, there are some inconsistencies here. I would agree with that, but I also think that we have to view the facts from the purview of Mr. Whitaker and and that's what keeps that's what we're kind of looking at that deposition. What are the facts from Mr. Whitaker as to I guess we'll take each officer if that's OK, particularly officer Dempsey. If we start with him in the five minutes. Yes, Judge Pryor. As as we or I should say as Mr. Whitaker testifies, he warned Officer Dempsey that he had an object. He said he was going to self-harm himself. He wanted help. He wanted counseling. And taking all that is true. It's it's what Mr. Whitaker, excuse me, what Officer Dempsey did and said and also did not do. And the fact that Officer Dempsey again as as we view the facts from from the perspective of Mr. Whitaker, Officer Dempsey, again, I'll keep this family friendly. F off, I don't give us. I don't care. It's it's those responses that. That lay the groundwork for deliberate indifference claim and then in addition, obviously the waiting for five minutes as as we allege, that's that's another factor. That's I would say another layer of deliberate indifference. A third layer of deliberate indifference would be the fact that he doesn't do anything with regards to getting counseling, at least not not initially or not quickly. So there's what I think makes this case somewhat unique from from the deliberate indifference perspective is is that we have again these multiple layers. What what Officer Dempsey says, what he does, which is basically nothing, what he doesn't do. Is Mr. Whitaker representing that during those five minutes, Officer Dempsey is watching Mr. Whitaker. The short answer would be yes, the little bit. If I can elaborate a little bit, it's it's not entirely clear from from the deposition testimony. And again, in this case, we're kind of hindered and that we only have one deposition, and that's obviously from the plaintiffs. The plaintiffs deposition. Why that's so I'm not obviously can't speak to that, but as I read the deposition testimony, it said he essentially was standing there. So if he's standing there for those five minutes watching Mr. Whitaker, because this goes to the judges reasoning that this the inconsistencies make it implausible. If he's standing there for the five minutes watching Mr. Whitaker. Officer Dempsey then would have seen Mr. Whitaker with the sharp object. Place it in the vent. Judge Prior, it's a good question. I'm not sure because because he could have done the cutting and then put it in the vent prior to Officer Dempsey being there. And that's again, and I'm not. I'm not trying to evade your honor's question. It's just that that that that's the reason why both of those things can't be true. Either officer Dempsey had to be there for the entirety of a five minute as Mr. Whitaker represented. Or at some point, Officer Dempsey could not have been there because Mr. Whitaker says he saw me. I showed the object and he just stood there, right? And I understand that that that's where the district court kind of went is that looking at that Supreme Court cases that one of these things can't be true. Certainly. And again, I would go back to the fact that we don't. We only have that one deposition. We do have some records from prison records, but they're not. They don't clarify much, but in the other issues obviously. You know when someone again going back to the mental state number one and number two, the bleeding out, it's not entirely clear. Maybe you know that that officer Dempsey left for a minute and then. But again, as far as the cutting object goes, the placement of it as I stand here, I don't have a good answer to that just because of the record. And again, all these these uncertainties of this case. And you know, if I can, if I can turn that into a positive for Mr. Whitaker, it would be that that's something that again, you know, it's almost like we're having a dialogue about. These are more fact questions and credibility questions and the credibility of Mr. Whitaker. And I fully can see that Mr. Whitaker has some credibility issues, but it's not the credibility. It's a whether or not he has raised a fact issue. And that's where I'm really trying to parse this for Dempsey in going. I guess we should move to the excessive force as well. Sure, and on the excessive force again that as we point out in the briefs, Mr. Whitaker's handcuffed. He's on the ground. He's obviously bleeding out. There's there's some again some uncertainty as to whether he's passed out or not. I'm not entirely clear as even as I stand here now, whether he was he was unconscious for a short time or a long time. So that context, the issue is obviously is Mr. Whitaker a threat, whether to the medical staff, officers, etc. And our position is he could not be a threat to anyone given that context and given being handcuffed and on the ground and bleeding out and all those things. Handcuffed and on the ground does not mean compliant. And he can still be thrashing around, right? Certainly. I guess my concern, Mr. Kelleher, is you know we have I certainly understand your general point about summary judgment, but we also have, for example, the sham affidavit rule. We have other lines of cases where in extreme cases a district court can take such fact issues away. And I certainly aren't. And if I can point out, obviously, your Honor's just heard an employment discrimination case. If I can make an analogy to that or breach of contract cases where there's often a, you know, he said, she said dispute. But in those in those realms, there's at least a history of shared interest. The employee worked for the employer. The two parties contracted. Here, obviously, we're dealing with an inmate guard scenario. This is a notoriously divisive relationship. Violence always looms. So what we have here is a different context. And again, I'm not I'm not saying that the officers are lying, but there's definitely there's definitely an issue of division of divisiveness between these these two camps, so to speak, and that that's just a reality of peniological life. But so again, I recognize Judge Hamilton that there are some mechanisms that the have to deal with these types of situations. But again, we're dealing with the situation where we have two two sides that really are diametrically opposed to one another and don't trust each other. So nothing further. Thank you, Your Honors. Ms. Hanson. May it please the Court, Counsel, Assistant Attorney General Christina Hanson, on behalf of defendants at Belize. The district court correctly applied the summary judgment standard and concluded that no reasonable jury could find on this record that Dempsey or Castaneda was deliberately indifferent to a serious risk that he would seriously harm himself or that DeBowles' use of a single burst of pepper spray during the August 9 incident constituted excessive force. At this stage, the evidence must be viewed in the light most favorable to Whitaker, but the court does not adopt a version of facts that is so blatantly contradicted by the record that no reasonable jury could believe it. It is the plaintiff's burden at summary judgment to come forward with evidence and create a genuine, triable issue of material fact. And plaintiff failed to meet his burden here. Whitaker's only evidence at trial, his deposition testimony, was contradicted by the evidence as well as was internally inconsistent and presented as an implausible version of events. Starting with the August 9 incident, the evidence did not give rise to a reasonable inference that Dempsey was aware of but failed to take reasonable steps to protect him from an imminent risk of serious self-harm. The undisputed evidence was that Dempsey checked Whitaker's cell during his 9 o'clock, during his 9 p.m. walk through the wing. Whitaker self-harmed and within minutes by Whitaker's own testimony, within minutes when he saw that Whitaker was bleeding, he contacted his supervisor for help. He contacted Boal. And that was the only step that Dempsey was authorized to take. The was, he wasn't permitted to enter a cell and do anything until he had contacted a supervisor and gotten backup. Whitaker's testimony that he displayed a piece of sharp metal when Dempsey allegedly refused to call a crisis counselor does not create a triable issue of fact because it's contradicted by his own prior statements. The incident report from the night of the incident, he self-reported that he had cut himself with a fingernail. He had an existing wound there and he had reopened it with his fingernail. And Whitaker's own testimony about the sharp incident simply didn't add up. It was contradicted by his own, by his own statements about the object. That first he had, he had the object and he hit it and then that he had to, you know, that he just had two different objects in the two incidents. And so his story just simply didn't add up. And beyond that, Dempsey took reasonable steps when he appreciated the risk of harm as Whitaker's own testimony was that as soon as he saw that, or when he saw that he had been there the entire time and when he saw that Whitaker was bleeding, he took the only step that was available to him, which was to call for backup and, and, um, assistance arrived and they were able to tend to his cut and he eventually was taken to the hospital. Um, and so, uh, Dempsey did, uh, obtain help when he realized when he appreciated a risk of harm. Ms. Hanson, um, obviously we're kind of out on the edge of summary judgment here. Um, and we don't expect all witnesses to be perfectly consistent from one statement to another. Um, I guess it's helpful to me if you focus on the internal contradictions between Plaintiff's different statements and impossibilities, uh, within his own statements, um, so that we, if we were to affirm, we would not wind up taking a wrecking ball to the summary judgment, uh, jurisprudence. Why has, are you asking me why? I'm asking you to focus not necessarily on what the defendants have said, uh, but on the different versions Plaintiff has provided and the internal contradictions within them. Does, does, does that give us a sufficient basis for affirming summary judgment without destroying limitations on, in guardrails on summary judgment? It does, Your Honor, because even if we, even if we put aside Dempsey's testimony, as, as the District Court did put aside Dempsey's testimony and, and concluded that Whitaker's account of events just simply didn't add up, just simply did not create a triable issue of fact. First, there was no, uh, his testimony that he displayed a metal object and, and threatened to cut himself with, uh, was internally inconsistent because, um, like I, like I mentioned, the incident report from the incident, he reported at the time contemporaneous with, um, with the incident that he used his fingernail to cut himself. Additionally, he was unclear about the object in his, um, again, at the time of the incident, he didn't mention having an object. In this complaint, he talked about having, um, a metal object, um, and he described it, he described the size of it and, um, but no metal object was found in his cell. The undisputed testimony is that after the incident, um, prison staff searched his cell and was unable to locate any object. And then, um, also his own statements were inconsistent with respect, again, to what the metal, what the metal object was. He had, in his complaint, um, in his amended complaint that he filed with counsel, he described having two separate, two separate metal pieces, one on the 9th and a different one on the 16th, and then in his had, that he had a metal object that was hidden in the vent, that that's what he used to cut himself on the 9th, and sometime before he, um, he was taken out of his cell, he hid that, um, instrument in the vent. And again, that's internally inconsistent with his own testimony, again, that, that Dempsey, that he asked Dempsey for help, that Dempsey was at his cell when he asked for help, or when he asked to see a, um, a mental health professional, uh, displayed the metal object, cut himself, and then went back and hid it in the, uh, in the cell's vent so that he could use it again on the 16th. And so... Didn't he also tell the hospital medical personnel that he used a pen? He did. He also told them, he told a different story to the, um, the incident report and then the hospital records indicated that he, uh, he had reported at the hospital that he used a pen. Um, and so based on his sort of shifting, changing narrative, no reasonable jury could find, um, that he, no reasonable jury could find that he, that, uh, that Dempsey was aware of but disregarded a substantial risk. What about the August 16th incident? Any inconsistencies there? Or are we more focused on injury? Well, in the, the August 16th injury, um, would fail. The August 16th incident fails at the outset because he doesn't establish an objectively serious risk of harm. Um, he doesn't have, uh, he didn't sustain a serious injury in that incident. By his own account, it was a cut. He, he did not seek, or he declined medical assistance for the cut. A nurse indicated that she was able to clean it and then he declined medical assistance. He didn't go to hospital for that incident. There wasn't significant bleeding. He simply didn't have an objectively serious, um, injury on that occasion. Um, he, um, he argued at summary judgment that he was a suicide risk but even that was for a lot of other records because the contemporaneous reports, he didn't, um, he didn't indicate that he was suicidal and he certainly didn't testify that he told, um, Castaneda that he was suicidal and so. Say it one more time. He didn't indicate in the contemporaneous reports, the medical reports at the time, he did not indicate that he was suicidal. The day of the incident as well as the day following the incident, um, he said that he cut himself because he was concerned about court. He never indicated that he was suicidal and there's no evidence that he told Castaneda or that Castaneda would have been aware that he was suicidal. Um, and so for, for those reasons, the August 16th, uh, incident also does not create a tribal issue effect on deliberate indifference. In the few minutes we have, let's move to the excessive force. Okay. Uh, that's the one that draws me a little, gets me a little somewhat concerned based on the judge's reasoning there. Um, I, and I highlighted it here. He could have reasonably misconstrued, Lieutenant Boyle could have reasonably misconstrued plaintiff's actions and believed if it turned out to be incorrect, that plaintiff was acting aggressively. How is not weighing the evidence? Because, uh, the district court disregard, we could disregard, um, by, by Whitaker's own testimony, um, he was moving his arms. He testified in his deposition that he moved and the blood sprayed. And so on an excessive force claim, we look at the, um, the, the prison official's state of mind because they're making the, the quick decision on whether, um, force is needed. And here, um, the force wasn't applied sadistically or maliciously, but to, but to restore order. And he used, I would note that he reused a single burst of pepper spray. It didn't cause any long-term injury, um, to Whitaker. And it was used for the purpose of restoring order. Uh, there's no dispute that blood splayed and that he moved, that he moved, he moved his arms. But there is no order. Mr. Whitaker did not testify that I was ordered to stop moving. He, the test, Mr. Whitaker testified that the nurse was trying to bandage me and I moved blood splattered and I was pepper sprayed. The follow-up question was, did Lieutenant Boyle ask you anything? No. Did he give you any orders? No. Um, again, um, taking the, um, the excessive force claim would be from Bull's perspective of whether there was a situation that warranted, that warranted action or force. And that single burst of pepper spray to restore order wouldn't rise to the level of excessive force. I guess I'm trying to figure out what was out of order. What was, how was he being non-compliant? He was moving his, he was moving his arms when, when they were trying to bandage him up and he was spilling, um, blood which was causing a health risk to the, to the prison staff that were trying to attend to his wound. And so the spray was simply to, to, um, ensure his compliance. Um, and then he was immediately, I would add he was immediately, um, as soon as his, his wound was attended to, he was, um, he was taken to, uh, to the wash station to, to rinse off. So there was no evidence, um, that he, what if we're simply pointing to no evidence that, that, um, Bull acted maliciously or with, with some other intent other than to, uh, ensure compliance in the, to ensure that the safety of the prison staff attending to his wound. And so for those reasons we ask that you affirm. Thank you. Thank you. Mr. Kelleher, I think you had used all your time, but I'll give you some extra time and rebuttal if you have something to say by way of response. Thank you, Judge Sykes. Um, as to the credibility issues, what makes this case unique is the fact that there's no extrinsic evidence, no video, no audio, uh, no documentary evidence, which, uh, belies what Mr. Whitaker had said. In other words, it's Mr. Whitaker himself, for better or for worse, that has created this credibility question. Um, and, and on that point, again, I would argue that a lot of this concerns trivialities like, like the size of the cutting object, but, but more importantly, again, it's that context we're dealing with a gentleman who by all, by all counts, irrefutable, has mental issues. And then the context of the jail and the context of bleeding out, um, a suicide attempt, or at least a maiming, a self-maiming attempt. So, so this is a different context from, I would say your typical, let's say corporate setting, or even a traffic arrest. This, this was a much more, um, extreme and stressful environment where, where he's bleeding out. As to the, um, um, excessive force, um, Judge Pryor, you hit the nail on the head. Um, there's, there's a definite, you're welcome. There's a definite credibility clash here. And, um, again, that's, that, that can't be resolved at summary judgment. So I, I appreciate the court's time. Thank you very much. We'll take the case under advisement.